## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| HARVEY GITLIN, Derivatively on Behalf of ICAHN ENTERPRISES L.P. | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. ) |
| CARL C. ICAHN, NANCY DUNLAP, DENISE BARTON, ALVIN B. KRONGARD, STEPHEN A. MONGILLO, MICHAEL NEVIN, TED PAPAPOSTOLOU, AND ANDREW TENO | ) ) **DEMAND FOR JURY TRIAL** ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| ICAHN ENTERPRISES L.P. | ) ) |
| Nominal Defendant. | ) ) ) ) |

## <u>VERIFIED UNITHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Harvey Gitlin ("Plaintiff"), by and through his attorneys, hereby submits this Verified Unitholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Icahn Enterprises L.P. ("Icahn Enterprises", "IEP" or the "Partnership") against Defendants (defined below). Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included a review of, among other things, public filings with the U.S. Securities and Exchange Commission ("SEC"),

1

news reports, press releases, related litigation and other public sources.

## SUMMARY OF THE ACTION

1.      According to its SEC filings, Icahn Enterprises is a master limited partnership founded in 1987 and its depositary units are traded on the NASDAQ exchange. Icahn Enterprises owns a 99% limited partner interest in Icahn Enterprises Holdings L. P. ("Icahn Enterprises Holdings). Icahn Enterprises Holdings and its subsidiaries own substantially all of Icahn Enterprises' assets and liabilities and conduct substantially all of its operations. Icahn Enterprises G.P. Inc. ("Icahn Enterprises GP"), which is indirectly owned and controlled by Mr. Carl C. Icahn ("Icahn"), owns a 1% general partner interest in each of Icahn Enterprises and Icahn Enterprises Holdings as of March 31, 2024, representing an aggregate 1.99% general partner interest in Icahn Enterprises and Icahn Enterprises Holdings.[1] Icahn Enterprises is a diversified holding company owning subsidiaries currently engaged in the following continuing operating businesses: Investment, Energy, Automotive, Food Packaging, Real Estate, Home Fashion and Pharma.

2.      Icahn, through affiliates, owns 100% of Icahn Enterprises GP, the general partner of Icahn Enterprises, and approximately 85% of Icahn Enterprises' outstanding depositary units as of June 30, 2024, and, as a result, has the ability to influence Icahn Enterprises' operations and affairs. Icahn was, in effect, the Partnership's majority and controlling unitholder. Icahn is well known on Wall Street as a "corporate raider" and "activist," who has achieved a public reputation of taking over distressed assets or companies and increasing their value.

---

[1] Icahn Enterprises Holdings maintained the same officers and directors as IEP and Icahn Enterprises G.P.

3.      Commencing in late October 2013, through early December 2014, IEP units traded on the NASDAQ exchange at over $100 per unit, reaching as high $148.53 per unit at the close of trading on December 9, 2013. But, for prolonged periods of time commencing in January 2016, the trading price of IEP units languished in the $50s, sometimes closing in the $60s, or at other times in the $40s. On February 27, 2018, IEP closed at $56.05 per unit, after which the trading price rose to a close of $62.05 per unit following IEP's announcement of a quarterly distribution ("dividend") increase from $1.50 per unit to $1.75 per unit – the first increase since March 2014

4.      The IEP unitholders received a dividend of $1.75 per unit for four straight quarters despite inconsistent financial metrics of performance during those quarters. With such a consistent dividend, IEP's unit price stabilized, climbing into the $60s and the $70s per unit, reaching as high as $80.32 at the close of trading on August 8, 2018, following IEP's August 2, 2018, disclosure of financial results for its second quarter 2018, ending June 30, 2018.

5.      By the beginning of August 2018, Icahn had incurred massive personal margin loan indebtedness. Icahn's massive personal margin loans, collateralized by his IEP holdings and his other personal assets, had been subject to debt covenants that required the maintenance of a loan-to-value ("LTV") ratio tethered to IEP's per unit trading price. Neither Icahn, IEP, nor any of the Defendants herein, when communicating with the market about dividend risk, ever disclosed the risk that the amount of any IEP quarterly dividend distributed to its investors would be or could be adversely affected by the violation of Icahn's personal debt covenants, and specifically the LTV ratio linked to IEP's unit price associated with his massive $3.7 billion margin loans, or the delinkage of those LTV ratio covenants and IEP's unit trading price. None of the Defendants was transparent with respect to this highly significant and material risk, following four years

3

and 16 consecutive quarters of distributing a $2 per unit quarterly dividend declared by the Icahn controlled Board, even amid inconsistent financial results.

6.     Icahn and the Defendants engaged in an undisclosed scheme to use heightened dividend yields as an inducement to buoy or inflate the trading price of IEP units as investors clamored to invest in a so-called "dividend stock," superficially offering increased asset values ("dividend inducement scheme"). IEP was paying over that period of time an extremely high rate of return on investment. This dividend inducement scheme was aided by Defendants' lack of transparency, coupled with false and misleading statements, and material omissions, to create the illusion that the Partnership's significant quarterly dividends were linked to its liquidity, no matter whether the Partnership had a profitable quarter or not.

7.     As a result of the ongoing lack of transparency and inflated asset valuations, an expert at Hindenburg Research published a report on May 2, 2023 (the "Hindenburg Report") alleging, among other things, that Icahn Enterprises' "last reported indicative year-end [net asset value] of $5.6 billion is inflated by at least 22%." The Hindenburg Report disclosed, among other things, that IEP's "last reported indicative year-end [net asset value] of $5.6 billion is inflated by at least 22%," noting that IEP was "using money taken in from new investors to pay out dividends." Hindenburg reported that "our research has found that IEP units are inflated by 75%" and "we've uncovered clear evidence of inflated valuation marks," while noting that in comparison to "all 526 US-based closed end funds (CEFs) in Bloomberg's database, Icahn Enterprises' premium to NAV was higher than all of them and more than double the next highest we found," while commenting that IEP's "outlier[]" dividend "is entirely unsupported by IEP's cash flow and investment performance." The Hindenburg Report noted that when IEP hiked the

quarterly dividend from $1.75 per unit to $2.00 per unit, IEPs free cash flow was negative $1.7 billion that same year. The Hindenburg Report identified specific instances of significant and material asset overvaluation, while noting that "the irregular valuation marks fit a pattern." Importantly, the Report made clear that "Icahn has not disclosed basic metrics around his margin loans like loan-to-value (LTV), maintenance thresholds, principle amount, or interest rates" adding "[w]e think unitholders deserve this information in order to understand the risk of margin calls should IEP unit [trading] prices revert toward NAV, a reality we see as inevitable," and predicted that IEP "will eventually cut or eliminate its dividend entirely", among other adverse observations.

8.      The Hindenburg Report also claimed that the Partnership operates a "ponzi-like economic structure" and "has been using money taken in from new investors to pay out dividends to old investors."

9.      After the Hindenburg Report was disclosed, Icahn Enterprises' unit price fell $10.06 per unit, or 20%, to close at $40.36 per unit on May 2, 2023, and continued to decline, losing about $7.5 billion in value through May 4, 2023 – totaling a 40% decline.

10.      In an attempt at damage control, the next day in a press release, Icahn Enterprises and Icahn chose to "reassure our long- term unitholders" that the claims of the Hindenburg Report "does not affect IEP's liquidity," adding "we are announcing now our intention to declare a distribution in the amount of $2.00 per depositary unit for the quarter ended March 31, 2023…." Icahn further stated that "[t]he fundamentals of our business, and our belief in the activist paradigm … remain unchanged. [W]e obviously disagree with the inflammatory assertions in the Hindenburg Report and intend to … vigorously defend IEP and its unitholders."

11.     Then, on May 10, 2023, Icahn Enterprises filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2023. Therein, the Partnership stated that the U.S. Attorney's office for the Southern District of New York contacted Icahn Enterprises on May 3, 2023, seeking production of information relating to the Partnership, certain of its affiliates' "corporate governance, capitalization, securities offerings, dividends, valuation, marketing materials, due diligence and other materials." The Partnership claimed it is "cooperating with the request" and is "providing documents in response to the voluntary request for information."

12.     On this news, Icahn Enterprises' unit price fell $5.75 per unit, or 15.1%, to close at $32.22 per unit on May 10, 2023.

13.     Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Partnership's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Icahn Enterprises was inflating its net asset value; (2) that the Partnership was using money taken in from new investors to pay out dividends to old investors; (3) that, as a result, the Partnership would become the subject of criminal and/or regulatory scrutiny; (4) Defendants engaged in an undisclosed scheme to use heightened dividend yields as an inducement to buoy or inflate the trading price of IEP units as investors clamored to invest in a so-called "dividend stock," superficially offering increased asset values; (5) the risk that the amount of any IEP quarterly dividend distributed to its investors would be or could be adversely affected by the violation of Icahn's personal debt covenants, and specifically the LTV ratio linked to IEP's unit price associated with his massive $3.7 billion margin loans, or the delinkage of those LTV ratio

6

covenants and IEP's unit trading price; and (6) that as a result of the foregoing, Defendants' positive statements and SEC filings about the Partnership's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

14. Additionally, Defendants' misconduct has subjected IEP to several civil federal securities fraud class action lawsuits (collectively, the "Securities Class Actions").

15. Ultimately, as detailed further herein, the SEC charged Icahn and IEP for failing to disclose information relating to Icahn's pledges of IEP securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders. IEP and Icahn agreed to pay $1.5 million and $500,000 in civil penalties, respectively, to settle the SEC's charges.

16. The Partnership has suffered massive losses from the waste of corporate assets as a result of the unjust enrichment of Defendants who were improperly overcompensated by the Partnership and/or who benefitted from the wrongdoing alleged herein as a result of the falsely inflated financial results.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C.§ 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

21.     Plaintiff is and was at all relevant times a unitholder of Nominal Defendant, Icahn Enterprises.

22.     Nominal Defendant Icahn Enterprises is a Delaware corporation and headquartered in Sunny Isles Beach, Florida.  Icahn Enterprises' Depositary Units trade on the Nasdaq Global Select Market (the "NASDAQ") under the symbol "IEP."

23.     Defendant Icahn has served as the controlling unitholder and Chairman of the Board of Directors of IEP since 1990. Since 2007, through his position as CEO of Icahn Capital LP, a wholly owned subsidiary of IEP, and certain related entities, Icahn's principal occupation has been managing private investment funds, including Icahn Partners LP and Icahn Partners Master Fund LP.

24.     Defendant Nancy Dunlap ("Dunlap") has served as a director of Icahn Enterprises GP, since April 2021 and is a member of the Audit Committee.

25.     Defendant Denise Barton ("Barton") as served as a director of Icahn Enterprises GP, since September 2019 and was a member of the Audit Committee from September 2019 until April 2021. Barton has been Chief Restructuring Officer and Chief Financial Officer of Icahn Automotive Group LLC, an automotive parts installer, retailer and distributor, since July 2021.

26.     Defendant Alvin B. Krongard ("Krongard") has served as a director since March 2019 and has served on the Audit Committee of IEP and Icahn Enterprises G.P., Inc. since March 2019.

27.     Defendant Stephen A. Mongillo ("Mongillo") has served as an Icahn Enterprises GP director since March 2020.  Mongillo also serves as a member of IEP's Audit Committee. Mongillo has also served as a director of CVR Energy, Inc., a majority owned subsidiary of Icahn Enterprises, since May 2012.

28.     Defendant Michael Nevin has served an Icahn Enterprises GP director since December 2018. Defendant Nevin has also served as CFO of Icahn Automotive Group, LLC, a subsidiary of Icahn Enterprises, from August 2019 to November 2022. Defendant Nevin is the son-in-law of Defendant Icahn.

29.     Defendant Ted Papapostolous has been the Chief Financial Officer of IEP and a member of the Board since November 8, 2021. Defendant Papapostolous holds identical positions at Icahn Enterprises Holdings L.P. and Icahn Enterprises G.P. Inc.

30.     Defendant Andrew Teno ("Teno") has served as President and Chief Executive Officer and as a director of Icahn Enterprises since February 2024. Prior to his appointment as President and CEO, Teno served as a portfolio manager at Icahn Capital LP, a subsidiary of Icahn Enterprises, since October 2020.

31.     Defendants Icahn, Dunlap, Barton, Krongard, Mongillo, Nevin, Papapostolou, and Teno are collectively referred to herein as the "Defendants" or "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By virtue of their positions as officers and directors of Icahn Enterprises, and because of their ability to oversee, direct, and control the business and corporate affairs of Icahn Enterprises, Defendants owed Icahn Enterprises and its unitholders fiduciary obligations of good faith, loyalty, and candor, and they were required to do their utmost to control and manage Icahn Enterprises in a fair, just, honest, and equitable manner. Defendants were required to act in the best interests of Icahn Enterprises and its unitholders and not in furtherance of their personal interest or benefit. Each director and officer of the Partnership owes to Icahn Enterprises and its unitholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Partnership and in the use and preservation of its property and assets. Defendants' neglect of their duties to the Partnership in essence decimated their duty of oversight.

33.     Defendants, because of their positions of control and authority as directors of Icahn Enterprises GP and officers of Icahn Enterprises, directly or indirectly exercised control over the wrongful acts complained of herein. Each of the Defendants had knowledge of material, nonpublic information regarding the Partnership.

34.     In the discharge of their duties, the officers of Icahn Enterprises and directors of Icahn Enterprises GP were required to exercise reasonable and prudent supervision over management, policies, practices, and controls of the financial affairs of Icahn Enterprises.

35.     As senior executive officers and directors of a publicly-traded company whose common units were registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter*

*alia*, the Partnership's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Partnership to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Partnership's units would be based upon truthful and accurate information. Thus, the oversight of Icahn Enterprises' internal and disclosure controls as well as the risks involved with the Partnership's acquisitions, fell squarely within the direct oversight responsibilities of the Icahn Enterprises Board and its Audit Committee.

36.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Icahn Enterprises, and/or Icahn Enterprises GP and were at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

37.     Icahn Enterprises is a master limited partnership holding company owning subsidiaries engaged in the following operating businesses: Investment, Energy, Automotive, Food Packaging, Real Estate, Home Fashion and Pharma. Defendant Icahn and his affiliates owned approximately 85% of Icahn Enterprises' outstanding depositary units as of December 31, 2022.

38.     IEP was founded by Icahn and was incorporated in Delaware in 1987 as a privately held equity fund.

39.     Ultimately, IEP was taken public in 1990 through an IPO that raised $157.5 million by selling shares at $12.50 each. Since then, IEP has become one of the largest private equity firms in America.

40.     The offering of IEP's units to the public, while still retaining almost absolute dominance and control, enabled Icahn to create a public market for his IEP units which enabled him to increase the value of his own unit through public representations regarding the Partnership's financial performance and, especially, through the issuance of per unit distributions ("dividends") to unitholders. These dividends were determined by Icahn and rubber-stamped by IEP's board of directors, which Icahn controlled from IEP's inception as IEP's ultra-dominant unit holder – owning approximately 85% of IEP's publicly traded units even after going public.

41.     Additionally, the public market for IEP depositary units benefited Icahn, who held the vast majority of those units, since any increase in the trading price of such IEP securities would greatly benefit Icahn personally. IEP units could also be used as debt collateral for Icahn's personal borrowings, making it easier for him to secure loans since there was a definable public market for his units, which could be valued and readily liquidated by lenders.

42.     The decision to take IEP public, without losing any control, presented the perfect environment by which Icahn could exploit turning his personal IEP units into a valuable marketable asset. IEP's marketable securities could also be used as currency for asset acquisitions or to secure new infusions of capital through periodic public offerings, while bolstering Icahn's own personal net worth and increase the asset portfolio of IEP.

43.     Because IEP was now publicly traded, Icahn secured massive margin loans from lenders using his IEP shares as collateral. During the Relevant Period, he had personal debt of approximately $3.7 billion. Since his IEP units were pledged as collateral, lenders imposed debt covenants requiring Icahn to meet a minimum level of LTV ratios, failing which he would be vulnerable to margin calls requiring him to make good on the margin debt through

massive repayments. While the  terms and amount of such loan were concealed, owing to an ongoing lack of transparency,  Icahn had been exposed personally in the event of a material decline in the trading  price of IEP units causing him to violate loan-to-value ratio conditions or covenants, which,  until July 10, 2023, were based on IEP's stock trading price. The margin loans Icahn  personally secured using his IEP holdings as collateral enabled him to use such acquired funds for his own personal benefit, separate and apart from benefiting the Partnership he controlled – IEP – or the investors who bought its shares.

## False and Misleading Statements

44.   As announced on August 2, 2018, on July 31, 2018, the IEP Board, controlled by Icahn, declared a  quarterly  dividend of $1.75 per depositary unit to IEP's unitholders. While IEP's filing with the SEC discussed the topic of dividend risk, Defendants did not fully or adequately disclose the  risk associated with Icahn's loan covenants. They did not disclose that the dividend  increase was arbitrarily determined, or was designed to support market demand for IEP  units, or was declared to buoy or enhance the trading price of IEP units in order to guard against a massive margin call with respect to Icahn's personal indebtedness that would arise from violating debt covenants regarding loan to value ratios based on the trading price of IEP units.

45.   On August 2, 2018 IEP issued a press release entitled "Icahn Enterprises L.P. Reports Second Quarter 2018 Financial Results."  The press release stated, in relevant part:

> Icahn Enterprises L.P. (NASDAQ: IEP) is reporting second quarter 2018 revenues  of $3.6 billion and net income attributable to Icahn Enterprises of $309 million, or $1.70 per depositary unit, including $164 million from continuing operations, or $0.90 per depositary unit. For the three months ended June 30, 2017 revenues were $4.5 billion and net income attributable to Icahn Enterprises was $1.6 billion, or $9.51 per depositary unit, including $1.5 billion  from  continuing  operations,  or $9.20 per depositary unit. The prior

year period includes a $1.0 billion gain, net of tax, from the sale of ARL in June 2017. For the three months ended June 30, 2018, Adjusted EBITDA attributable to Icahn Enterprises was $356 million compared to $288 million for the three months ended June 30, 2017. For the three months ended June 30, 2018, Adjusted EBIT attributable to Icahn Enterprises was $270 million compared to $195 million for the three months ended June 30, 2017.

For the six months ended June 30, 2018, revenues were $6.7 billion and net income attributable to Icahn Enterprises was $446 million, or $2.48 per depositary unit, including $272 million from continuing operations, or $1.52 per depositary unit. For the six months ended June 30, 2017 revenues were $7.0 billion and net income attributable to Icahn Enterprises was $1.5 billion, or $9.77 per depositary unit, including $1.5 billion from continuing operations, or $9.23 per depositary unit. The prior year period includes a $1.0 billion gain, net of tax, from the sale of ARL in June 2017. For the six months ended June 30, 2018, Adjusted EBITDA attributable to Icahn Enterprises was $664 million compared to $468 million for the six months ended June 30, 2017. For the six months ended June 30, 2018, Adjusted EBIT attributable to Icahn Enterprises was $490 million compared to $287 million for the six months ended June 30, 2017.

For the six months ended June 30, 2018 indicative net asset value increased to $8.4 billion compared to $7.9 billion as of December 31, 2017.

46.    On February 28, 2019, IEP issued a press release entitled "Icahn Enterprises L.P. Reports Fourth Quarter and Full Year 2018 Financial Results." The press release stated in relevant part:

Icahn Enterprises L.P. (NASDAQ: IEP) is reporting for the year ended December 31, 2018, revenues of $11.8 billion and net income attributable to Icahn Enterprises of $1.5 billion, or $11.46 per depositary unit, including a loss of $213 million from continuing operations, or $1.16 per depositary unit. For the year ended December 31, 2017, revenues were $12.6 billion and net income attributable to Icahn Enterprises was $2.4 billion, or $14.80 per depositary unit, including $2.3 billion from continuing operations, or $13.84 per depositary unit. For the year ended December 31, 2018, Adjusted EBITDA attributable to Icahn Enterprises was $561 million compared to $642 million for the year

ended December 31, 2017. For the year ended December 31, 2018, Adjusted EBIT attributable to Icahn Enterprises was $264 million compared to $323 million for the year ended December 31, 2017.

For the fourth quarter of 2018, revenues were $2.8 billion and net income attributable to Icahn Enterprises was $935 million, or $8.03 per depositary unit, including a loss of $434 million from continuing operations, or $2.28 per depositary unit. For the three months ended December 31, 2017, revenues were $2.5 billion and net income attributable to Icahn Enterprises was $298 million, or $1.76 per depositary unit, including $279 million from continuing operations, or $1.65 per depositary unit. For the three months ended December 31, 2018, Adjusted EBITDA attributable to Icahn Enterprises was a loss of $104 million compared to a loss of $96 million for the three months ended December 31, 2017. For the three months ended December 31, 2018, Adjusted EBIT attributable to Icahn Enterprises was a loss of $176 million compared to a loss of $177 million for the three months ended December 31, 2017.

For the year ended December 31, 2018, indicative net asset value increased to $8.2 billion compared to $7.9 billion as of December 31, 2017.

*       *       *

**Distribution**

Icahn Enterprises has a long history of endeavoring to return capital to its unitholders by declaring and paying significant and consistent annual distributions. As a reminder –

> Icahn Enterprises estimated annual distribution of $8.00 per depositary unit for fiscal year 2019

> Icahn Enterprises declared annual distributions of $7.00 per depositary unit for fiscal year 2018

> Icahn Enterprises declared annual distributions of $6.00 per depositary unit for fiscal year 2017

> Icahn Enterprises declared annual distributions of $6.00 per depositary unit for fiscal year 2016

> Icahn Enterprises declared annual distributions of $6.00

per depositary unit for fiscal year 2015

Icahn Enterprises declared annual distributions of $6.00 per depositary unit for fiscal year 2014

Most recently, on February 26, 2019, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit ($8.00 per unit annualized) which will be paid on or about April 17, 2019 to depositary unitholders of record at the close of business on March 11, 2019. Depositary unitholders will have until April 8, 2019 to make an election to receive either cash or additional depositary units; if a holder does not make an election, it will automatically be deemed to have elected to receive the dividend in cash. Depositary unitholders who elect to receive additional depositary units will receive units valued at the volume weighted average trading price of the units on NASDAQ during the 5 consecutive trading days ending April 15, 2019. No fractional depositary units will be issued pursuant to the distribution payment. Icahn Enterprises will make a cash payment in lieu of issuing fractional depositary units to any holders electing to receive depositary units. Any holders that would only be eligible to receive a fraction of a depositary unit based on the above calculation will receive a cash payment.

Icahn Enterprises L.P., a master limited partnership, is a diversified holding company engaged in eight primary business segments: Investment, Energy, Automotive, Food Packaging, Metals, Real Estate, Home Fashion and Mining.

47.    On February 28, 2020, IEP issued a press release entitled "Icahn Enterprises L.P. Reports Fourth Quarter and Full Year 2019 Financial Results" which reported, among other things, that for the year ended December 31, 2019, "revenues were $9.0 billion and net loss attributable to Icahn Enterprises was $1.1 billion, or $5.38 per depositary unit[.]" In addition, it was reported that for the year ended December 31, 2019, "indicative net asset value decreased to $7.07 billion compared to $8.15 billion as of December 31, 2018." The press release also noted the declaration of a quarterly distribution of $2.00 per depositary unit. The press release stated in relevant part:

Icahn Enterprises L.P. (NASDAQ: IEP) is reporting fourth quarter 2019 revenues of $2.6 billion and net loss attributable to Icahn Enterprises of $157 million, or $0.74 per depositary unit, including a loss from continuing operations of $149 million, or $0.70 per depositary unit. For the three months ended December 31, 2018, revenues were $2.8 billion and net income attributable to Icahn Enterprises was $930 million, or $8.01 per depositary unit, including a loss from continuing operations of $439 million, or $2.30 per depositary unit. For the three months ended December 31, 2019, Adjusted EBITDA attributable to Icahn Enterprises was $111 million compared to $(108) million for the three months ended December 31, 2018. For the three months ended December 31, 2019, Adjusted EBIT attributable to Icahn Enterprises was $22 million compared to $(188) million for the three months ended December 31, 2018.

For the year ended December 31, 2019 revenues were $9.0 billion and net loss attributable to Icahn Enterprises was $1.1 billion, or $5.38 per depositary unit, including a loss from continuing operations of $1.1 billion, or $5.23 per depositary unit. For the year ended December 31, 2018, revenues were $11.8 billion and net income attributable to Icahn Enterprises was $1.5 billion, or $11.33 per depositary unit, including a loss from continuing operations of $238 million, or $1.29 per depositary unit. For the year ended December 31, 2019, Adjusted EBITDA attributable to Icahn Enterprises was $(462) million compared to $557 million for the year ended December 31, 2018. For the year ended December 31, 2019, Adjusted EBIT attributable to Icahn Enterprises was $(818) million compared to $224 million for the year ended December 31, 2018.

For the year ended December 31, 2019, indicative net asset value decreased to $7.07 billion compared to $8.15 billion as of December 31, 2018.

On February 26, 2020, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit, which will be paid on or about April 28, 2020 to depositary unitholders of record at the close of business on March 20, 2020. Depositary unitholders will have until March 17, 2020 to make an election to receive either cash or additional depositary units; if a unitholder does not make an election, it will automatically be deemed to have elected to receive the distribution in cash. Depositary unitholders

who elect to receive additional depositary units will receive units valued at the volume weighted average trading price of the units on NASDAQ during the 5 consecutive trading days ending April 24, 2020. No fractional depositary units will be issued pursuant to the distribution payment. Icahn Enterprises will make a cash payment in lieu of issuing fractional depositary units to any unitholders electing to receive depositary units. Any unitholders that would only be eligible to receive a fraction of a depositary unit based on the above calculation will receive a cash payment.

48.     On February 26, 2021, IEP issued a press release entitled "Icahn Enterprises L.P. Reports Fourth Quarter and Full Year 2020 Financial Results." The press release stated in relevant part:

Icahn Enterprises L.P. (NASDAQ: IEP) is reporting fourth quarter 2020 revenues of $2.8 billion and net income attributable to Icahn Enterprises of $146 million, or $0.61 per depositary unit. For the three months ended December 31, 2019, revenues were $2.6 billion and net loss attributable to Icahn Enterprises was $157 million, or a loss of $0.74 per depositary unit, including a loss of $149 million from continuing operations, or a loss of $0.70 per depositary unit. For the three months ended December 31, 2020, Adjusted EBITDA attributable to Icahn Enterprises was $420 million compared to $111 million for the three months ended December 31, 2019. For the three months ended December 31, 2020, Adjusted EBIT attributable to Icahn Enterprises was $328 million compared to $22 million for the three months ended December 31, 2019.

For the year ended December 31, 2020, revenues were $6.1 billion and net loss attributable to Icahn Enterprises was $1.7 billion, or a loss of $7.33 per depositary unit. For the year ended December 31, 2019, revenues were $9.0 billion and net loss attributable to Icahn Enterprises was $1.1 billion, or a loss of $5.38 per depositary unit, including a loss of $1.1 billion from continuing operations, or $5.23 per depositary unit. For the year ended December 31, 2020, Adjusted EBITDA attributable to Icahn Enterprises was $(738) million compared to $(462) million for the year ended December 31, 2019. For the year ended December 31, 2020, Adjusted EBIT attributable to Icahn Enterprises was $(1.1) billion compared to $(818) million for the year ended December 31, 2019.

18

On February 24, 2021, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit, which will be paid on or about April 28, 2021 to depositary unitholders of record at the close of business on March 26, 2021. Depositary unitholders will have until April 16, 2021 to make an election to receive either cash or additional depositary units; if a holder does not make an election, it will automatically be deemed to have elected to receive the distribution in additional depositary units. Depositary unitholders who elect to receive (or are deemed to have elected to receive) additional depositary units will receive units valued at the volume weighted average trading price of the units on Nasdaq during the 5 consecutive trading days ending April 23, 2021. No fractional depositary units will be issued pursuant to the distribution payment. Icahn Enterprises will make a cash payment in lieu of issuing fractional depositary units to any holders electing to receive depositary units. Any holders that would only be eligible to receive a fraction of a depositary unit based on the above calculation will receive a cash payment. For distributions declared by the Board in prior quarters, the default election (for holders that did not make an election) was a cash distribution. The default election (for holders that do not make an election) for the distribution to be paid on or about April 28, 2021 will be a distribution paid in additional depository units, a change from prior quarters.

49.     On February 25, 2022, IEP issued a press release entitled "Icahn Enterprises L.P. Reports Fourth Quarter and Full Year 2021 Financial Results." IEP reported, among other things, that for the year ended December 31, 2021, revenues were $11.3 billion and net loss attributable to Icahn Enterprises was $518 million, or $2.32 per depositary share. The press release stated in relevant part:

Icahn Enterprises L.P. (NASDAQ: IEP) is reporting fourth quarter 2021 revenues of $2.3 billion and net loss attributable to Icahn Enterprises of $396 million, or a loss of $1.72 per depositary unit. For the three months ended December 31, 2020, revenues were $2.8 million and net income attributable to Icahn Enterprises was $146 million, or $0.61 per depositary unit. For the three months ended December 31, 2021, Adjusted EBITDA attributable to Icahn Enterprises was ($443) million compared to $423 million for the three months ended December 31,

2020.

For the year ended December 31, 2021, revenues were $11.3 billion and net loss attributable to Icahn Enterprises was $518 million, or a loss of $2.32 per depositary unit. For the year ended December 31, 2020, revenues were $6.1 billion and net loss attributable to Icahn Enterprises was $1.7 billion, or a loss of $7.33 per depositary unit. For the year ended December 31, 2021, Adjusted EBITDA attributable to Icahn Enterprises was $273 million compared to ($735) million for the year ended December 31, 2020.

The full-year 2021 results were negatively impacted by losses of $1.3 billion on IEP's Investment segment short positions (used to hedge our long positions). Other losses included $435 million of RINs expense and $205 million of Automotive transformation losses and inventory write-downs.

For the twelve months ended December 31, 2021, indicative net asset value increased by $1.6 billion to $5.1 billion despite the headwinds mentioned above. The change in indicative net asset value includes, among other things, changes in the fair value of certain subsidiaries which are not included in our GAAP earnings reported above. In addition, in the third and fourth quarters of 2021, we revised how we estimate the fair value of our Automotive segment's owned real estate to reflect the improvement of its real estate leasing operations and its Services business to reflect current market multiples which better reflects the fair value of the assets, both of which contributed to the positive change in indicative net asset value.

On February 23, 2022, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit, which will be paid on or about April 27, 2022, to depositary unitholders of record at the close of business on March 18, 2022. Depositary unitholders will have until April 14, 2022, to make a timely election to receive either cash or additional depositary units. If a unitholder does not make a timely election, it will automatically be deemed to have elected to receive the distribution in additional depositary units. Depositary unitholders who elect to receive (or who are deemed to have elected to receive) additional depositary units will receive units valued at the volume weighted average trading price of the units during the five consecutive trading days ending April 22, 2022. Icahn Enterprises will make a cash payment in lieu of issuing fractional depositary units to any unitholders electing to receive (or who

are deemed to have elected to receive) depository units.

50.     A Form 10-K for the period ending December 31, 2022, filed by IEP with the SEC (the "2022 Form 10-K") included a footnote referring, in passing, to Icahn's use of certain IEP units to "secure certain personal indebtedness":

> The number of depositary units pledged to secure these loans fluctuates in certain years and from time to time as a result of changes in the amount of outstanding principal amount of the loans, the market price of the depositary units, and other factors. Mr. Icahn has advised that he and his affiliates have sufficient additional assets to satisfy any obligations pursuant to these loans without recourse to the depositary units, he has no need or intention to allow foreclosure on such collateral, and that he is current on all principal and interest payments with respect to the loans, and there has never been an event of default or a default under any of the loans.

51.     Despite disclosing the existence of this indebtedness, at no point did Defendants acknowledge or disclose the substantial risk to Icahn in the event of a margin call, or that Defendants were engaging in the dividend inducement scheme for the purpose of artificially inflating the trading price of IEP units to forestall or prevent such a margin call.

52.     On February 24, 2023, IEP issued a press release entitled "Icahn Enterprises L.P. Reports Fourth Quarter 2022 Financial Results." The press release stated in relevant part:

> Icahn Enterprises L.P. (NASDAQ: IEP) is reporting revenues of $14.1 billion and net loss attributable to Icahn Enterprises of $183 million, or $0.57 per depositary unit, for the twelve months ended December 31, 2022. For the twelve months ended December 31, 2021, revenues were $11.3 billion and net loss attributable to Icahn Enterprises was $518 million, or $2.32 per depositary unit. Adjusted EBITDA attributable to Icahn Enterprises was $758 million for the twelve months ended December 31, 2022, compared to $273 million for the twelve months ended December 31, 2021.

> Fourth quarter 2022 revenues were $3.1 billion and net loss attributable

to Icahn Enterprises was $255 million, or a loss of $0.74 per depositary unit. For the three months ended December 31, 2021, revenues were $2.3 billion and net loss attributable to Icahn Enterprises was $396 million, or a loss of $1.72 per depositary unit. For the three months ended December 31, 2022, Adjusted EBITDA attributable to Icahn Enterprises was a loss of $54 million compared to a loss of $443 million for the three months ended December 31, 2021.

For the twelve months ended December 31, 2022, indicative net asset value increased by $522 million to $5.6 billion. The change in indicative net asset value includes, among other things, changes in the fair value of certain subsidiaries which are not included in our GAAP earnings reported above.

On February 22, 2023, the Board of Directors of the general partner of Icahn Enterprises declared a quarterly distribution in the amount of $2.00 per depositary unit, which will be paid on or about April 19, 2023, to depositary unitholders of record at the close of business on March 13, 2023. Depositary unitholders will have until April 6, 2023, to make a timely election to receive either cash or additional depositary units. If a unitholder does not make a timely election, it will automatically be deemed to have elected to receive the distribution in additional depositary units. Depositary unitholders who elect to receive (or who are deemed to have elected to receive) additional depositary units will receive units valued at the volume weighted average trading price of the units during the five consecutive trading days ending April 14, 2023. Icahn Enterprises will make a cash payment in lieu of issuing fractional depositary units to any unitholders electing to receive (or who are deemed to have elected to receive) depositary units.

53.    Defendants issued materially false and misleading statements. The above statements identified above were materially false and/or misleading, and failed to disclose material adverse facts about the Partnership's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Icahn Enterprises was inflating its net asset value; (2) that the Partnership was using money taken in from new investors to pay out dividends to old investors; (3) that, as a result, the Partnership would become the subject of criminal and/or

regulatory scrutiny; (4) Defendants engaged in an undisclosed scheme to use heightened dividend yields as an inducement to buoy or inflate the trading price of IEP units as investors clamored to invest in a so-called "dividend stock," superficially offering increased asset values; (5) the risk that the amount of any IEP quarterly dividend distributed to its investors would be or could be adversely affected by the violation of Icahn's personal debt covenants, and specifically the LTV ratio linked to IEP's unit price associated with his massive $3.7 billion margin loans, or the delinkage of those LTV ratio covenants and IEP's unit trading price; and (6) that as a result of the foregoing, Defendants' positive statements and SEC filings about the Partnership's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

54.     Concealed from the market Defendants' *dividend inducement scheme* by which IEP and the Individual Defendants used heightened dividend yields as an inducement to buoy or inflate the trading price of IEP units and insulate Icahn from a massive margin call on his personal margin loan deceived investors clamored to invest in a so-called "dividend stock," ostensibly offering increased asset values.

**The Truth Begins to Emerge**

55.     On May 2, 2023, Hindenburg Research published a report alleging, among other things, that Icahn Enterprises' "last reported indicative year-end [net asset value] of $5.6 billion is inflated by at least 22%." The Hindenburg Report also claimed that the Partnership operates a "ponzi-like economic structure" and "has been using money taken in from new investors to pay out dividends to old investors." The Hindenburg Report stated in relevant part:

> Icahn Enterprises (IEP) is an ~$18 billion market cap holding company run by corporate raider and activist investor Carl Icahn, who, along with his son Brett, own approximately 85% of the company.

*Our research has found that IEP units are inflated by 75%+ due to 3 key reasons:*
***(1) IEP trades at a 218% premium to its last reported net asset value (NAV), vastly higher than all comparables (2) we've uncovered clear evidence of inflated valuation marks for IEP's less liquid and private assets (3) the company has suffered additional performance losses year to date following its last disclosure.***

Most closed-end holding companies trade around or at a discount to their NAVs. For comparison, vehicles run by other star managers, like Dan Loeb's Third Point and Bill Ackman's Pershing Square, trade at discounts of 14% and 35% to NAV, respectively.

We further compared IEP to all 526 U.S.-based closed end funds (CEFs) in Bloomberg's database. Icahn Enterprises' premium to NAV was higher than all of them and more than double the next highest we found.

A reason for IEP's extreme premium to NAV, based on a review of retail investor- oriented media, is that average investors are attracted to (a) IEP's large dividend yield and (b) the prospect of investing alongside Wall Street legend Carl Icahn. Institutional investors have virtually no ownership in IEP.

Icahn Enterprises' current dividend yield is ~15.8%, making it the highest dividend yield of any U.S. large cap company by far, with the next closest at ~9.9%.

As a result of the company's elevated unit price, its annual dividend rate equates to an absurd 50.5% of last reported indicative net asset value.

The company's outlier dividend is made possible (for now) because Carl Icahn owns roughly 85% of IEP and has been largely taking dividends in units (instead of cash), reducing the overall cash outlay required to meet the dividend payment for remaining unitholders.

The dividend is entirely unsupported by IEP's cash flow and investment performance, which has been negative for years. IEP's investment portfolio has lost ~53% since 2014. The company's free cash

24

flow figures show IEP has cumulatively burned ~$4.9 billion over the same period.

Despite its negative financial performance, IEP has raised its dividend 3 times since 2014. IEP's most recent dividend increase came in 2019, when it raised quarterly distributions from $1.75 to $2.00 per unit. IEP's free cash flow was negative $1.7 billion in the same year.

Given that the investment and operating performance of IEP has burned billions in capital, the company has been forced to support its dividend using regular open market sales of IEP units through at-the-market (ATM) offerings, totaling $1.7 billion since 2019.

***In brief, Icahn has been using money taken in from new investors to pay out dividends to old investors. Such ponzi-like economic structures are sustainable only to the extent that new money is willing to risk being the last one "holding the bag".***

Supporting this structure is Jefferies, the only large investment bank with research coverage on IEP. It has continuously placed a "buy" rating on IEP units. In one of the worst cases of sell-side research malpractice we've seen, Jefferies' research assumes in all cases, even in its bear case, that IEP's dividend will be safe "into perpetuity", despite providing no support for that assumption.

Since 2019, one bank has run all of IEP's $1.7 billion in ATM offerings: Jefferies. In essence, Jefferies is luring in retail investors through its research arm under the guise of IEP's 'safe' dividend, while also selling billions in IEP units through its investment banking arm to support the very same dividend.

***Adding to evidence of IEP's unsustainability, we estimate that IEP's last reported indicative year-end NAV of $5.6 billion is inflated by at least 22%, due to a combination of overly aggressive marks on IEP's less liquid/private investments and continued year to date underperformance.***

***In one example, IEP owns 90% of a publicly traded meat packaging business that it valued at $243 million at year-end. The company had a market value of only $89 million at the time. In other words, IEP marked the value of its public company equity holdings 204% above the prevailing public market price.***

25

The mark is even more irregular given that IEP bought over a million shares of the company in December before immediately writing up the value of those shares by ~194% in the same month.

***In another instance, IEP marked its "Automotive Parts" division at $381 million in December 2022. Its key subsidiary declared bankruptcy a month later.***

IEP reported $455 million in "real estate holdings" in its most recent quarter. The reported values in this segment have been remarkably stable for years despite declining net income and despite including (i) the Trump Plaza in Atlantic City, which was razed to the ground in 2021; (ii) a country club that became nearly insolvent in 2020 before ownership reverted to its members in 2021; and (iii) a lack of transparency on other assets and valuations.

***The irregular valuation marks fit a pattern: In January of 2020, UBS dropped coverage of IEP citing a "lack of transparency" following its research showing marks that were "divergent from their public market values", among other issues.***

Beyond aggressive marks, Icahn's liquid portfolio has continued to generate losses. Our analysis of Icahn's latest December 2022 13-F filing indicates that IEP's long holdings have lost ~$471 million in value year to date, despite the S&P gaining ~9.2% in the same time frame.

IEP disclosed that its investment fund had a 47% notional short bet in its December 2022 filings. Given the positive market performance, we estimate this short bet has contributed at least a further $272 million in year-to-date losses.

***Overall, we estimate IEP's current NAV as being closer to $4.4 billion, or 22% lower than its disclosed year-end indicative NAV of $5.6 billion. The analysis suggests that units currently trade at a 310% premium to NAV, with an annual dividend rate of 64% of NAV.***

Tightening matters further, IEP is highly levered, with $5.3 billion in Holdco debt and maturities of $1.1 billion, $1.36 billion, and $1.35 billion due in 2024, 2025, and 2026, respectively.

IEP's debt covenants limit the company's financial flexibility: IEP is not

permitted to incur additional indebtedness and is only allowed to refinance old debt. With interest rates having increased, IEP will need to pay significantly higher interest expenses on future refinancings.

Carl Icahn's ownership in IEP comprises about 85% of his overall net worth, according to Forbes, giving him limited room to maneuver with his own outside capital. We have assessed that Icahn has little ability or reason to bail out IEP with a capital injection, particularly at such elevated unit prices.

Further underscoring Icahn's limited financial flexibility, he has pledged 181.4 million units, ~60% of his IEP holdings, for personal margin loans. Margin loans are a risky form of debt often reliant on high share (or unit) prices.

Icahn has not disclosed basic metrics around his margin loans like loan to value (LTV), maintenance thresholds, principal amount, or interest rates. We think unitholders deserve this information in order to understand the risk of margin calls should IEP unit prices revert toward NAV, a reality we see as inevitable.

Given limited financial flexibility and worsening liquidity, we expect Icahn Enterprises will eventually cut or eliminate its dividend entirely, barring a miracle turnaround in investment performance.

Overall, we think Icahn, a legend of Wall Street, has made a classic mistake of taking on too much leverage in the face of sustained losses: a combination that rarely ends well.

56.    On this news, Icahn Enterprises' share price fell $10.06 per share, or 20%, to close at $40.36 per share on May 2, 2023.

57.    Then, on May 10, 2023, before the market opened, Icahn Enterprises filed its Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2023. Therein, IEP stated that the U.S. Attorney's office for the Southern District of New York contacted Icahn Enterprises on May 3, 2023 seeking production of information relating to the Partnership, certain of its affiliates' "corporate governance, capitalization, securities offerings, dividends,

valuation, marketing materials, due diligence and other materials." The Partnership claimed it is "cooperating with the request" and is "providing documents in response to the voluntary request for information." The Form 10-Q stated in relevant part:

> The U.S. Attorney's office for the Southern District of New York contacted Icahn Enterprises L.P. on May 3, 2023 seeking production of information relating to it and certain of its affiliates' corporate governance, capitalization, securities offerings, dividends, valuation, marketing materials, due diligence and other materials. We are cooperating with the request and are providing documents in response to the voluntary request for information. The U.S. Attorney's office has not made any claims or allegations against us or Mr. Icahn with respect to the foregoing inquiry. We believe that we maintain a strong compliance program and, while no assurances can be made and we are still evaluating the matter, we do not currently believe this inquiry will have a material impact on our business, financial condition, results of operations or cash flows.

58.     In the same quarterly report, Icahn Enterprises reported a $226 million charge related to Auto Plus, which Hindenburg had identified as an overvalued holding:

> With respect to our Automotive segment, we have invested significant resources in various initiatives to remain competitive and stimulate growth. Despite these efforts, in January 2023, Auto Plus filed the Chapter 11 Cases in Bankruptcy Court. As a result of this filing, the Company has determined that it no longer controls Auto Plus and has deconsolidated its investment in Auto Plus effective as of January 31, 2023 resulting in a non-cash charge of $226 million recorded in the three months ended March 31, 2023 and determined that our remaining equity investment in Auto Plus is now worth $0.

59.     On this news, Icahn Enterprises' share price fell $5.75 per share, or 15.1%, to close at $32.22 per share on May 10, 2023.

60.     That same day the IEP Board controlled by Icahn issued a press release intended to blunt the impact of the Hindenburg Report and obscure and overcome its valid analysis and disclosure of the truth, hypocritically entitled "Icahn Enterprises Responds to Self-Serving Short

Seller Report" ("May 10, 2023 Press Release"). Therein, the IEP Board reiterated that "the greatest paradigm for investment success is activism," and boasted of its ability "over the years" to generate shareholder value "through activist campaigns where we were able to guide boards and CEOs to take the steps necessary to enhance the value of their companies," while also assuring investors that "[w]e expect that, over time, IEP's performance will speak for itself. We have a strong balance sheet, with $1.9 billion of cash and $4 billion of additional liquidity," adding that "[t]he good news for IEP's investors is that we have Carl, the liquidity, the strategy and the know-how to fight back."

61.    The May 10, 2023 Press Release, issued by IEP's Board over the PR Newswire, was itself deceptive and misleading, further asserting its false narrative about net asset values, while concealing the truth and the still concealed dividend inducement scheme and related risk. It continued to conceal the fact of a margin risk due to potential margin calls respecting Icahn's personal margin debt in the event of declining unit prices, or because the trading price of IEP units was linked to covenants respecting Icahn's personal debt, it also concealed the risk that delinkage of unit trading prices from Icahn's loan-to-value ratios would itself occasion an adverse impact on the amount of dividends awarded by IEP's Board, even in the face of substantial liquidity. Nor did the May 10, 2023 Press Release disclose the deceptive manner in which net asset values were being presented to the market.

62.    On the morning of July 10, 2023, before the opening of trading, IEP filed a Report on Form 8-K with the SEC constituting a "Regulation FD Disclosure" which stated as follows with regard to Icahn's personal margin loan:

On July 10, 2023, Carl Icahn and certain of his affiliates entered into

a three-year term loan agreement (the "Loan Agreement") with certain bank lenders, which amends and restates previous loan agreements with the lenders and consolidates all borrowings of Mr. Icahn … and provides for a principal payment of $500 million on or before September 1, 2023, quarterly principal payments of $87.5 million beginning in September 2024….the obligations under the Loan Agreement are secured by pledges of an aggregate of 320 million depositary units of IEP owned by Mr. Icahn and $2 billion of interests owned by Mr. Icahn in the private investment funds managed by IEP.

…a margin call may only be triggered in the event that the loan-to-value ratio set forth in the Loan Agreement is not maintained. Unlike the previous loan agreements, for purposes of the loan-to-value ratio set forth in the Loan Agreement, the value of the pledged depositary units will be calculated based upon IEP's indicative net asset value rather than the market price of the depositary units.

63.     On July 10, 2023, Reuters reported that Defendant Carl Icahn had restructured $3.7 billion in personal loans to "remove a link between his obligation to post collateral and his holding company's share price buoying the stock which had been battered following an attack by short-seller Nathan Anderson." The July 10, 2023 Reuters article further noted that the Hindenburg Report "posed a threat to Icahn, who owns 85% of IEP and had used about 60% of his stake in the company to borrow from a group of banks. Icahn was obligated to post more collateral as the value of IEP's stock dropped" adding that "the share price milestones that triggered these obligations have not been disclosed." Reuters further reported that, following the restructuring, Icahn's requirements to post more collateral was tied to the "IEP's indicative net asset value, rather than IEP's share price, according to the filings," adding that "[I]n the amended loan agreement, Icahn agreed to provide additional collateral of $2 billion from his personal funds and 320 million IEP shares."

30

64.     Reuters further reported that "Icahn will repay principal of $500 million on  or before September 1, either quarterly principal payments of $87.5 million beginning a  year after that, and a final principal payment of $2.5 billion at the end of the term, according  to the filings."

**The Full Truth Comes to Light**

65.     In a press release disseminated to the market on August 4, 2023,  entitled "Icahn Enterprises L.P. (Nasdaq: IEP) today announced its Second Quarter 2023   Financial Results" ("Second Quarter 2023 Press Release"), it was reported that IEP had a   net loss of $269 million or $0.72 per depositary unit compared to a net loss of $128 million  or $0.41 per depositary unit in the second quarter of 2022. Adjusted EBITDA for the  Second Quarter 2023 was $34 million compared to $126 million for the quarter. The  Second Quarter 2023 Press Release reported that "indicative net asset value declined to $5.0 billion as of June 30, 2023, compared to $5.6 billion as of December 31, 2022.

66.     With respect to IEP's liquidity as of June 30, 2023, it had cash and cash equivalents of $2.488 billion compared to $2.337 billion as of December 31, 2022, with  cash held at consolidated affiliated partnerships and restricted cash of $2.598 billion as of  June 30, 2023 compared to $2.549 billion as of December 31, 2022.

67.     The Second Quarter 2023 Press Release quoted statements made by  controlling unitholder, Icahn, who  further engaged in a strategy of deflection, falsely blaming the Hindenburg Report, which  unveiled much of the adverse, undisclosed truth about IEP, for causing a decline of the  trading price of IEP units and short selling respecting companies in which IEP invests or controls.  Icahn acknowledged entering into the three year term loan agreement (while   facing a massive margin call) with his personal lenders that "in [his] opinion … significantly diffused the

effects" of the Hindenburg Report "and focused on our activist  strategy and reduced our hedge book," while stating that "[t]hese actions have been a major  factor in what I believe is IEP turning the corner in July," adding that "[i]n the month of July, our publicly traded securities, which are included in our indicative net asset value, experienced over a $500 million increase in value, net of all hedge positions."

68.     Nonetheless, despite "turning the corner in July" and increasing value, and  contrary to  prior  practice  and  statements,  especially  those  statements  relating  the  $2  dividends  to liquidity, not other financial metrics of performance, and contrary to the  practice of paying the $2 per unit quarterly dividend for sixteen successive quarters, from  March 2019 through the first quarter 2023, despite significant inconsistency of financial  results over that time (as reflected in the charts and graphs IEP's above), Icahn – his  massive personal loans LTV ratios no longer tethered  to  IEP's  trading  price—had  no  further  need  to  continue  the  dividend  inducement scheme.  As a result, he revealed a  different, rather opaque, approach to dividends, stating: "[T]he payment of future  distributions will be determined by the board of directors quarterly, based upon current  economic conditions and business performance and other factors that it deems relevant at  the time declaration of a distribution is considered."

69.     Then, despite claiming that IEP does not intend to let the Hindenburg Report "interfere with this practice." IEP lowered the boom on investors by revealing that "IEP is  declaring a $1.00 per depositary unit distribution" for the second quarter. This was the  lowest quarterly dividend distribution since even before February 10, 2013 – ten years  earlier – when the Icahn controlled Board had raised the quarterly dividend tenfold, from $0.10 to $1.25 per depositary unit.

70.     As a direct and proximate result of the Second Quarter 2023 Press Release and drastic dividend cut to a level below what was last   seen since the Icahn controlled Board had declared a dividend of $1.25 per depositary unit  on August 6, 2013 – 10 years earlier – despite healthy liquidity, and Partnership refutations  regarding the Hindenburg Report – the trading price of IEP depositary units substantially    declined from $32.68 per unit at the close of trading on August 3, 2023 to close at $25.09  on August 4, 2013, on historic  trading  volume  of  over 11,282,300 units in a single day.  The IEP unit trading price continued its decline thereafter, to a close as low as $20.78 on  August 23, 2023, on massive volume often well over 1 million units per day.  It descended  even further to close at $16.50 per depositary unit on October 31, 2023, and a close of $16.42 on November 21, 2023.

### Icahn and EIP are Charged by the SEC and Icahn and IEP Pay $2 Million to Settle Charges

71.     On August 19, 2024 the SEC charged Icahn and IEP for failing to disclose pledges of or failing to disclose information relating to Icahn's pledges of IEP securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders.  The SEC said Icahn, who established himself as a ruthless corporate raider before adopting the friendlier mantle of activist investor, pledged anywhere from 51% to 82% of Icahn Enterprises, or IEP, units outstanding to secure billions worth in margin loans without disclosing that fact to unitholders or federal regulators.

72.     IEP and Icahn agreed to pay $1.5 million and $500,000 in civil penalties, respectively, to settle the SEC's charges.

73.     According to the SEC's orders, from at least December 31, 2018, through the present, Icahn, who is IEP's controlling unitholder and Chairman of the board of directors of IEP's general partner, pledged approximately 51% to 82% of IEP's outstanding securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders. Notwithstanding Icahn's various margin loan agreements and amendments, IEP failed to disclose Icahn's pledges of IEP securities as required in its Form 10K until February 25, 2022. Icahn also failed to file amendments to Schedule 13D describing his personal margin loan agreements and amendments, which dated back to at least 2005, and failed to attach required guaranty agreements. Icahn's failure to file the required amendments to Schedule 13D persisted until at least July 9, 2023.

74.     The SEC's orders find that IEP violated Section 13(a) of the Securities Exchange Act of 1934 and Rule 13a-1 thereunder and that Icahn violated certain beneficial ownership reporting provisions of the Exchange Act. Without admitting or denying the findings, IEP and Icahn agreed to cease and desist from future violations and to pay the civil penalties referenced above.

**DERIVATIVE AND DEMAND FUTILITY
ALLEGATIONS FOR THE BOARD OF ICAHN ENTERPRISES**

75.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

76.     Plaintiff brings this action derivatively  on behalf of IEP to redress injuries already suffered and injuries that continue to be suffered  as a direct and proximate result of the misconduct alleged herein. IEP  is named as a nominal Defendant solely in a derivative capacity.

77.     Plaintiff will fairly and adequately represent the interests of the Partnership in enforcing and prosecuting its rights.

78.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their engagement, either knowingly or recklessly, in the schemes alleged herein, including schemes to make and/or cause the Partnership to make false and misleading statements and omissions of material fact while inflating net asset value, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

79.     Plaintiff did not make a demand on the Board to take remedial action on behalf of Icahn Enterprises against its own members because such a demand  would have been a futile, wasteful and useless act.

**Demand Is Futile Because a Majority of the Board Could Not Have Exercised Disinterested and Independent Business Judgment in Considering the Demand**

80.     At the time of this filing, Icahn Enterprises' Board consists of nine members – Defendants Icahn, Barton, Dunlap, B. Icahn, Krongard, Mongillo, Nevin, Papapostolou, and Teno (the "Director Defendants").  The Director Defendants were and remain beholden to Defendant Icahn, who, through his affiliates, holds approximately 85% of the Partnership's outstanding depositary units.  Moreover, as set forth, the Director Defendants financially rely on Defendant Icahn and his connections and affiliations. For these reasons, the Director Defendants would not be able to respond with appropriate disinterestedness in a demand against him and certain of the other Defendants.

81.     The Board exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate internal controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur.  Such failures could not have been an exercise of good faith business judgment.

**Substantial Likelihood of Liability for the Entire Board of Directors**

82.     Defendants face a substantial likelihood of liability in this action because of their admitted failure, as directors and/or officers, to assure that a reliable system of financial controls was in place and functioning effectively.  The dramatic breakdown and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure of liability.

83.     Furthermore, Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage and oversee the Partnership which has, as alleged herein, severely impacted the Partnership's financial condition and future prospects.

84.     By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Partnership, exposed the Partnership to millions of dollars of liability in securities class action lawsuits, and have potentially threatened Icahn Enterprises' ability to exist in the future.  Defendants caused or allowed Icahn Enterprises to mislead its unitholders and the general public.

85.     Each Director Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed that all relevant information, including but not limited to information regarding the Partnership's business, its revenues, classification of expenses and the veracity of the Partnership's financial disclosures

36

and projections.  Director Defendants either evaluated this information and intentionally or recklessly rubber-stamped Icahn Enterprises' misrepresentations, or recklessly failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

86.    Demand is futile as to the Director Defendants because they failed to disclose Icahn's pledges of IEP securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders. According to the SEC, Icahn pledged anywhere from 51% to 82% IEP units outstanding to secure billions worth in margin loans without disclosing that fact to unitholders or federal regulators. IEP and Icahn agreed to pay $1.5 million and $500,000 in civil penalties, respectively, to settle the SEC's charges.

87.    Each of the Director Defendants face a substantial likelihood of liability in this action because of his/her failure, as a director, to assure that reliable systems of controls were implemented and functioning effectively to prevent the Partnership from issuing materially misleading statements.  Based on the size, scope, and blatancy of the wrongdoing, the Director Defendants must have known, or were reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading and/or omitted material information necessary not to make the statements materially misleading.  Accordingly, Director Defendants face substantial exposure to liability for their total abrogation of oversight.

### Additional Likelihood of Liability for the Audit Committee Members

88.    The Board has one standing committee: the Audit Committee.  Per the Audit Committee Charter, the committee is responsible for assisting the Board in its fulfillment of its responsibility for the oversight of: i) the quality or integrity of the Partnership's financial

statements; ii) the performance and independence of the Partnership's independent auditor; and iii) the performance of the Partnership's internal audit function; and iv) the Partnership's compliance with legal and regulatory requirements.

89. Demand on Defendant Icahn is futile as he is Icahn Enterprises GP's Chairman of the Board, and is the Partnership's controlling unitholder, thus, as the Partnership admits, he is a non-independent director. Defendant Icahn was Icahn Enterprises' Chairman and controlling unitholder when the Partnership inflated its net asset value and operated its business with a "ponzi-like dividend scheme," and thus, was ultimately responsible for the conduct of the Partnership during that time.

90. Demand is also futile as to Icahn because he failed to disclose his pledges of IEP securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders. According to the SEC, Icahn pledged anywhere from 51% to 82% IEP units outstanding to secure billions worth in margin loans without disclosing that fact to unitholders or federal regulators. IEP and Icahn agreed to pay $1.5 million and $500,000 in civil penalties, respectively, to settle the SEC's charges.

91. Defendant Icahn conducted little, if any, oversight of the Partnership's internal controls over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Icahn is also named as a defendant in the Securities Class Actions. Thus, for these reasons, too, Defendant Icahn breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

92.     Demand on Defendant Teno is futile as Teno serves as the Partnership's President and CEO and director since February 2024 and is beholden to Defendant Icahn.   Prior to his appointment as President and CEO, Teno served as a portfolio manager at Icahn Capital LP, a subsidiary of Icahn Enterprises, since October 2020.   Defendant Teno receives significant compensation as CEO and remains beholden to Icahn.

93.     Demand on Defendant Papapostolou is futile as he has served as CFO since November 2021 and a director since December 2021. Thus, as the Partnership admits he is a non-independent director. Moreover, Defendant Papapostolou was on the Board at the time the Partnership was inflating its net asset value and engaged in the "ponzi-like" dividend scheme. Defendant Papapostolou is beholden to Defendant Icahn; Icahn Enterprises provides Defendant Papapostolou with his principal occupation serving as CFO of Icahn Enterprises. Furthermore, from March 2007 to March 2020, Defendant Papapostolou has served in various progressive accounting positions at Icahn Enterprises. Defendant Papapostolou also has served as a director of Viskase Companies, Inc., since April 2020, a company indirectly controlled by Defendant Icahn. As a director, Defendant Papapostolou conducted little, if any, oversight of the Partnership's internal controls over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Papapostolou is also named as a defendant in the Securities Class Actions. Thus, for these reasons, too, Defendant Papapostolou breached his fiduciary duties, faces

a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

98.     Demand on Defendant Barton is futile as she has served as a director since September 2019 and is beholden to Defendant Icahn.   Barton has been Chief Restructuring Officer and Chief Financial Officer of Icahn Automotive Group LLC, an automotive parts installer, retailer and distributor, since July 2021.  Furthermore, Director Barton served on the board and the audit committee for Viskase Companies, Inc., a subsidiary of Icahn Enterprises from May 2016 until January 2022. Furthermore, Defendant Barton served on the board and audit committee of Trump Entertainment Resorts, Inc., a subsidiary of Icahn Enterprises. Defendant Barton was on the Partnership's Board at the time the Partnership was inflating its net annual value and engaged in the "ponzi-like" dividend scheme. As director and previous member of IEP's Audit Committee (September 2019 until April 2021), Defendant Barton conducted little, if any, oversight of the Partnership's internal controls over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Thus, for these Defendant Barton breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

99.     Defendant Brett has served on the Board since October 2020. The Company admits in its SEC filings that Defendant Brett is a non-independent director. Director Brett is beholden to Defendant Icahn.  Defendant Brett has served in several roles for Icahn Enterprises and its subsidiaries including as a Portfolio Manager for Icahn Capital LP, and a consultant for Icahn Enterprises.

Furthermore, Defendant Brett is the son of the controlling shareholder, Defendant Icahn. Defendant Brett was on the Company's Board at the time the Company was engaged in inflating its net annual value and engaged in the "ponzi-like" dividend scheme. As a director, he conducted little if any oversight of the Company's internal control over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such control over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Brett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100.    Demand is on Defendant Krogard is futile as he has served as a director since March 2019 and was  a member of the Audit Committee during the Relevant Period and is thus especially culpable for the Partnership's false and misleading statements and omissions relating to financial information, including the material omissions that the Partnership's net asset value was inflated. As a director, and member of the Audit Committee he conducted little, if any, oversight of the Partnership's internal controls over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Krongard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101.    Demand on Defendant Dunlap is futile as she served as a director of Icahn Enterprises' general partner, Icahn Enterprises GP, since April 2021 and is a member of the Audit

Committee. As a director, and member of the Audit Committee she conducted little, if any, oversight of the Partnership's internal controls over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, too, Defendant Dunlap breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

102. Demand on Defendant Mongillo is futile as he was  a member of the Audit Committee during the Relevant Period and is thus especially culpable for the Partnership's false and misleading statements and omissions relating to financial information, including the material omissions that the Partnership's net asset value was inflated. Mongillo is beholden to Defendant Icahn. Defendant Mongillo served as a director for CVR Energy, Inc., a majority owned subsidiary of Icahn Enterprises, since May 2012. Furthermore, Defendant Mongillo previously served as managing director for of Icahn Capital LP from January 2008 until January 2011, and director of WestPoint Home, LLC from March 2009 until January 2011, both companies are indirectly controlled by Defendant Icahn. Moreover, he served as director of American Railcar Industries, Inc. from 2009 until 2011, a company which formerly was indirectly controlled by Defendant Icahn. Defendant Mongillo was on the Board at the time the Partnership was engaged in inflating its net annual value and engaged in the "ponzi-like" dividend scheme. As a director, he conducted little if any oversight of the Partnership's internal control over public reporting of financial statements and of the Partnership's engagement in the schemes described herein, consciously disregarded his duties to monitor such control over reporting and engagement in the schemes, and

42

consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant Mongillo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.     Defendant Nevin has served as a director of Icahn Enterprises GP since December 2018.  Nevin is also beholden to Icahn as Nevin has been employed as CFO of Icahn Automotive Group LLC, an automotive parts installer, retailer and distributor wholly-owned by IEP, since February 2020. Nevin served as a Managing Director at Icahn Enterprises L.P., a diversified holding company engaged in a variety of businesses, including investment, automotive, energy, food packaging, metals, real estate and home fashion, from June 2018 to August 2020. From July 2015 to June 2018, Nevin served as a Financial Analyst at Icahn Enterprises. Nevin is responsible for analyzing and monitoring portfolio companies for Icahn Enterprises L.P.  Nevin is also Icahn's son-in-law.

## COUNT I
### Against All Individual Defendants for Breach of Fiduciary Duty

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred two (102) as if fully set forth herein for this paragraph one hundred three (103).

104.     The Individual Defendants, by reason of their positions as officers and directors of Icahn Enterprises and because of their ability to control the business and corporate affairs of Icahn Enterprises, owed Icahn Enterprises fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Icahn Enterprises in a fair, just, honest, and equitable manner.

105.    Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Partnership from engaging in the unlawful acts complained of herein. The Individual Defendants repeatedly encouraged and/or acquiesced in unlawful and unethical behavior throughout the Partnership's business operations.

106.    The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity alleged herein. The Individual Defendants either knew, were reckless, or were grossly negligent in not knowing that Icahn Enterprises lacked effective disclosure controls and internal controls over financial reporting throughout its business and operations, which had subjected the Partnership's financial information to numerous errors and misstatements.

107.    The Individual Defendants' misconduct was not due to an honest error in judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

108.    Accordingly, the Individual Defendants breached their fiduciary duties to the Partnership.

109.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Icahn Enterprises has sustained significant damages, as alleged herein, including without limitation, the precipitous decline in Icahn Enterprises' value following the public disclosure of the wrongful acts complained of herein.

110.    Plaintiff, on behalf of Icahn Enterprises, has no adequate remedy at law.

**COUNT II**
**Against Defendants Icahn and Papapostolous for Contribution Under Sections 10(b) and 21D of the Exchange Act**

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs one (1) through one hundred two (102) as if fully set forth herein for this paragraph one hundred eleven (111).

112.    Icahn Enterprises and Defendant Papapostolous are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Partnership is found liable in the Securities Class Actions for these violations of the federal securities laws, the Partnership's liability will be in whole or in part due to Defendant Icahn and Defendant Papapostolous willful and/or reckless violations of their obligations as officers and/or director of Icahn Enterprises.

113.    Because of their positions of control and  authority over Icahn Enterprises, they were able to and did, directly and/or  indirectly, exercise control over the business and corporate affairs of Icahn Enterprises, including the wrongful acts complained of herein and in the Securities Class Actions.

114.    Accordingly, these Defendants liable under 15 U.S.C. § 78j(b),which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

115.    As such, IEP is entitled to receive all appropriate contribution or  indemnification from Defendant Papapostolous.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of Icahn Enterprises against the Defendants, jointly and severally, as set forth herein as follows:

a)   Declaring that Plaintiff may maintain this action on behalf of Icahn Enterprises,  and that Plaintiff is an adequate representative of the Partnership;

b)   Declaring that the Individual Defendants breached and/or aided and  abetted the breach of their and other members of the Board's fiduciary duties to Icahn Enterprises;

c)   Determining and awarding to Icahn Enterprises the damages sustained by it as a  result of the violations set forth above from each of the Individual Defendants, jointly and  severally, together with pre-judgment and post-judgment interest thereof;

d)   Directing Icahn Enterprises and the Individual Defendants to take all necessary actions to reform and improve Icahn Enterprises' corporate governance and internal procedures to  comply with applicable laws and to protect Icahn Enterprises and its unitholders from a repeat of the  damaging events described herein;

e)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

f)   Granting such other and further relief as the Court may deem just and  proper.

## <u>JURY DEMAND</u>

116.   Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: September 4, 2024

Respectfully Submitted,

**LAW OFFICE OF JOSE D. SOSA, P.C.**
Attorneys for Plaintiff
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: **(**561) 670-8237
E-Mail: pepe@pepesosalaw.com
sosalaw@yahoo.com

**/s/ JOSE D. SOSA**
JOSE D. SOSA
Florida Bar No.: 150878

and

William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com
-and-
212 W. Spring Valley Road
Richardson, TX 75081
*Attorneys for Plaintiff*
Pro Hac Vice Motion to be Filed